UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YVES GELIN,

                             Plaintiff,

        v.

TIMOTHY GEITHNER, Secretary of the Treasury,

                          Defendant.

Case No. 06-CV-10176 (KMK)

OPINION AND ORDER

Appearances:

Yves Gelin
Yonkers, New York
*Pro Se Plaintiff*

Carolina A. Fornos, Esq.
United States Attorney's Office
Southern District of New York
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      Plaintiff Yves Gelin brings this action against the Secretary of the Treasury

("Defendant"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII"), alleging that he has been discriminated against by Defendant on the basis of his

race and national origin and in retaliation for his prior invocation of the Equal Employment

Opportunity ("EEO") process.[1]  Presently before the Court is Defendant's motion for summary

judgment.  For the reasons set forth below, Defendant's motion is granted.

---

[1] Timothy Geithner, the current Secretary of the Treasury, took office as of January 26, 2009.  Pursuant to Fed. R. Civ. P. 25(d)(1), he is automatically substituted as the defendant for his predecessor in office, Henry M. Paulson, who had been named as the defendant in Plaintiff's Complaint.

<u>I. Background</u>

<u>A. Factual Background</u>

<u>1. Plaintiff and His Supervisors</u>

Plaintiff, a black male of Haitian descent, is employed by the Internal Revenue Service

("IRS") as a Grade-Service Level ("GSL") 13 Internal Revenue Agent ("RA").[2]  From

September 2004 until October 2005, Wandalee McLaughlin ("McLaughlin") oversaw RAs at

several posts of duty ("PODs"), including Plaintiff's POD, and was Plaintiff's immediate

supervisor and Group Manager.  (Pl.'s Decl. Ex. ("Pl.'s Ex.") P (Suppl. Decl. of Wandalee

McLaughlin Prepared in Connection with Pl.'s EEO Compl. No. 05-2614, dated May 22, 2006),

at 1.)  During that time, McLaughlin's direct supervisor was John Richard Smith ("Smith"), who

in his capacity as Territory Manager was second-line manager to all of the agents in

McLaughlin's group, including Plaintiff.  (Pl.'s Ex. R (Decl. of J. Richard Smith Prepared in

Connection with Pl.'s EEO Compl. No. 05-2614), at 1.)  Smith's direct manager at the time was

William P. Marshall ("Marshall"), the Director for the North Atlantic Examination area.  (Pl.'s

Ex. S (Decl. of William P. Marshall Prepared in Connection with Pl.'s EEO Compl. No. 06-

2185, dated May 24, 2006), at 12.)  Marshall never directly supervised or managed Plaintiff.

---

[2] The term Grade-Service Level refers to a federal government employee's pay level.  *See* Bureau of Labor Statistics, Career Guide to Industries:  Federal Government Excluding the Postal Service, *available at* http://www.bls.gov/oco/cg/cgs041.htm (last visited Mar. 12, 2008). "Advancement for most workers in the Federal Government," including the IRS, is "based on a system of occupational pay levels, or 'grades.'"  *Id.*  "Workers typically enter the Federal civil service at the starting grade for an occupation and begin a 'career ladder' of promotions until they reach the full-performance grade for that occupation."  *Id.*  Plaintiff entered the IRS as an RA at GSL-11 in 1987.  (Decl. of Carolina Fornos Ex. ("Def.'s Ex.") B (Tr. of Dep. of Yves Gelin) (hereinafter "Tr."), at 7-8.)  He was promoted to GSL-12 in 1990 and to GSL-13 in 2004. (*Id.*)

(*Id*.)  In January 2006, Kathleen McLoughlin ("McLoughlin") replaced McLaughlin as Plaintiff's first-line manager.  (Pl.'s Ex. O (Decl. of Kathleen McLoughlin Prepared in Connection With Pl.'s EEO Compl. No. 05-2614, dated May 24, 2006), at 1.)

Plaintiff cites to ten incidents or circumstances that occurred between September 2004 and May 2006 that he contends violated Title VII.  The Court will discuss the factual background of each alleged incident.

<u>2. Plaintiff's Transfer from the White Plains POD</u>

Plaintiff was promoted on September 19, 2004 from GSL-12 to GSL-13, and he received an increase in salary.  (Def.'s Local Rule 56.1 Statement of Undisputed Facts ("Def.'s 56.1 Stmt.") ¶ 17; Pl.'s Ex. R, at 1.)  Plaintiff alleges that around the same time, he was reassigned from the White Plains POD to the New Windsor POD, near Poughkeepsie, ostensibly to "isolate [him] from [the] White Plains Office" to which he had been assigned since 1988.  (Compl. ¶ 8.h.)  According to Smith, Plaintiff "was not reassigned to isolate him."  (Pl.'s Ex. R, at 2.)  Rather, Smith stated that Plaintiff was reassigned to the New Windsor POD, near Poughkeepsie, after Plaintiff's promotion to ensure that GSL-13 RAs reported to higher-graded GSL-14 managers.  (*Id*.)  In addition to Plaintiff, two other GSL-13 RAs were also assigned to the New Windsor POD.  (*Id*.)  According to both Smith and McLaughlin, "although [Plaintiff] was assigned to the New Windsor group and manager, he did not physically move from the White Plains office."  (Pl.'s Ex. R, at 2; Pl.'s Ex. P, at 3.)

<u>3. Assignment to Previously Classified Cases</u>

In or about April or May 2005, McLaughlin assigned Plaintiff to audit several cases that

he had previously classified.[3]  (Compl. ¶ 8.i; McLaughlin Decl. ¶¶ 13-15.)  Plaintiff contends

that this was an act of retaliation because it would have presented a conflict of interest for him to

work on these cases.  (Compl. ¶ 8.i; McLaughlin Decl. ¶ 15.)  When McLaughlin assigned the

cases to Plaintiff, she was unaware that he had previously classified them.[4]  (McLaughlin Decl. ¶

15.)  Plaintiff notified McLaughlin by e-mail on April 15, 2005, that she had assigned him

several tax returns that he had previously classified and that he believed that this posed a conflict

of interest.  (Pl.'s Local Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1 Stmt.") ¶ 21;

Def.'s 56.1 Stmt. ¶ 21; McLaughlin Decl. ¶ 13, Ex. B.)  After checking into the IRS policy,

McLaughlin notified Plaintiff that he was correct that it would be inappropriate for him to work

on those tax returns.  (Pl.'s 56.1 Stmt. ¶ 22; Def.'s 56.1 Stmt. ¶ 22; McLaughlin Decl. ¶ 13, Ex.

B.)  She asked Plaintiff to give these tax returns back to her, explaining that she would assign

different returns to him.  (McLaughlin Decl. ¶ 13, Ex. B.)  Plaintiff returned the cases without

working on them.  (Pl.'s 56.1 Stmt. ¶ 23; Def.'s 56.1 Stmt. ¶ 23.)  Plaintiff offers no evidence

suggesting that this exchange adversely affected his employment.

### 4. Management's Inaction on Plaintiff's Harassment Allegation

Plaintiff complains that on June 16, 2005, he reported to Marshall that the Group Clerk,

Carol Marinucci ("Marinucci"), had harassed him, but he never received a response from

Marshall.  (Compl. ¶ 8.j.)  Defendant contends that Marinucci's conduct did not constitute

---

[3] "Classification" is the process by which RAs "physically examine the individual returns to identify potential audit issues."  (Decl. of Wandalee McLaughlin ("McLaughlin Decl.") ¶ 11.)

[4] Plaintiff claims McLaughlin had to know that Plaintiff had previously classified these cases (Tr. 106), but he provides no evidence which directly or even circumstantially backs up this assertion.

4

harassment.  (Def.'s Mem. of Law in Supp. Mot. for Summ. J. ("Def.'s Mem.") 9-10.)  Plaintiff

and Marinucci have never met in person.  (Def.'s 56.1 Stmt. ¶ 32; Pl.'s 56.1 Stmt. ¶ 32.)  Rather,

Plaintiff's claim of harassment stems from e-mail correspondence between himself and

Marinucci on May 16, 2005 and May 23, 2005.  (Pl.'s 56.1 Stmt. ¶ 32; Def.'s 56.1 Stmt. ¶ 33;

Tr. 170-73.)  As the Group Clerk, one of Marinucci's duties was to send periodic e-mails to all

agents in McLaughlin's group to remind them to submit monthly reports, known as IVL reports.

(Pl.'s 56.1 Stmt. ¶ 31; Def.'s 56.1 Stmt. ¶ 31; McLaughlin Decl. ¶ 17, Ex. C.)  In response to

such an e-mail sent by Marinucci to all members of McLaughlin's group, Plaintiff responded as

follows:

> Every month I submit my IVL to you.  It appears that your
> manager Wanda McLaughlin is ordering you to keep bothering me
> every day.  Please stop it, I also have legal rights.  This IVL was
> submitted to you at the month end.

(McLaughlin Decl. Ex. C.)  In a lengthy e-mail response to Plaintiff's e-mail, Marinucci

explained that when she has not received IVL reports from RAs on the day that they are due, she

"usually start[s] calling Agents and requesting the information."  (*Id*.)  In the portion of

Marinucci's e-mail that Plaintiff alleges constitutes harassment (Tr. 170-73), Marinucci stated:

> I do not appreciate your sarcasm when I do this, I am doing my job
> and what is required of me.  If **ANY AGENT** does not have the
> required information, I will call/e-mail **that agent** or if more than
> one, **those agents**.  I should not need to call or e-mail anyone, as
> all Agents are aware of what is expected and required of them.
>
> You are making my position very hard to do and very
> uncomfortable.  I do not feel that you should speak/write to me in
> that way and do not expect you to address me in that way in the
> future.  My Manager does not tell me who to contact regarding
> reports or in any other matter.  I have been doing this job for 11
> years and I know what is expected of me and what I need to do and
> what to request to complete my job.

5

(McLaughlin Decl. Ex. C (emphases in original).)  Plaintiff e-mailed a response to Marinucci's

e-mail restating his position that her initial e-mail "was a provocation, although [she] tried to

cover [herself] by putting every[one's] name on it."  (*Id*.)  Subsequently, he forwarded

Marinucci's e-mail to Marshall, stating that "group manager Wanda McLaughlin is abusing her

authority by ordering her secretary to provoke me."  (McLaughlin Decl. Ex. C; Compl. ¶ 8.j.)

Although Marshall does not recall the specific e-mail, he stated that he "received innumerable e-

mail messages . . . from [Plaintiff] asserting a variety of allegations regarding . . . interactions

with management and other employees."  (Pl.'s Ex. S (Decl. of William P. Marshall Prepared in

Connection with Pl.'s EEO Compl. No. 05-2614, dated Feb. 13, 2006), at 3.)  He would "refer all

such messages to lower levels of management and Labor Relations Staff," but on the advice of

General Legal Services, he would "not respond to these messages."  (*Id*.)

### 5. Plaintiff's Assignment to Twenty-One Partnership Cases

Plaintiff contends that in July 2005 he was assigned by McLaughlin to twenty-one

partnership cases.  (Compl. ¶ 8.k.)  Defendant concedes that McLaughlin may have assigned

Plaintiff twenty-one partnership cases over the course of several months.  Generally, "a tax

return filed by a taxpayer in White Plains would get reviewed by a[n] [RA] in [] White Plains

[]."  (McLaughlin Decl. ¶ 4.)  When McLaughlin assigned cases to RAs, she would assign the

"more complex tax returns . . . to the most senior [RAs] under [her] supervision," which were

GSL-13 RAs.  (*Id*. ¶ 6.)  As partnership cases may be more complicated than individual or S-

Corporation tax returns, "those cases are more properly assigned to more senior [RAs]."  (*Id*. ¶

7.)  Because Plaintiff was the only GSL-13 RA under McLaughlin's supervision in White Plains,

he was "necessarily . . . issued the most complex White Plains tax returns."  (*Id*. ¶ 6.)  In any

6

event, Plaintiff was able to return the partnership cases that he was not able to handle.

(McLaughlin Decl. ¶ 9; Pl.'s 56.1 Stmt. ¶ 28; Def.'s 56.1 Stmt. ¶ 28.)  "Plaintiff was not

reprimanded, and his evaluation was not affected" by his return of some of the partnership cases

"because agents are allowed to return tax returns depending on varying work loads."

(McLaughlin Decl. ¶ 9; Pl.'s 56.1 Stmt. ¶ 29; Def.'s 56.1 Stmt. ¶ 29.)

### 6. Disappearance of Closed Cases

Plaintiff alleges that he also was discriminated and retaliated against between July 2005

and October 2005, when McLaughlin notified Plaintiff that she had not received several cases

that he said he had closed.  (Compl. ¶ 8.l.)  The IRS Internal Revenue Manual ("IRM") requires

that when shipping via UPS, the sender must complete a Form 3210 to track returns.  *See* IRS.,

Internal Revenue Manual § 1.4.40.4.2.6, *available at* http://www.irs.gov/irm/ (last visited Mar.

5, 2009) (hereinafter "IRM").  The Form 3210 must identify the taxpayer's name, social security

number, employer identification number, tax period, the person to whom it is being sent, the date

it was sent, and the transmittal code.  *See id*.  The sender must sign and date the form and keep a

copy.  *See id*.  The recipient must sign the Form 3210 and return acknowledgment to the sender

upon receipt of the return.  *Id*.  If the sender does not receive an acknowledgment within ten

days, he must perform an immediate follow-up by phone or mail.  *See id*.

In July 2005, Plaintiff e-mailed McLaughlin to inform her that he had closed two cases in

April, but those cases were still listed on his inventory.  (McLaughlin Decl. ¶ 24, Ex. G; Def.'s

56.1 Stmt. ¶ 38; Pl.'s 56.1 Stmt. ¶ 38.)  McLaughlin asked Plaintiff to fax the Form 3210 so that

she could trace the cases.  (McLaughlin Decl. ¶ 24, Ex. G; Def.'s 56.1 Stmt. ¶ 39; Pl.'s 56.1

Stmt. ¶ 39.)  Plaintiff was unable to find the Form 3210, claiming that McLaughlin never

7

returned the acknowledgment to him.  (McLaughlin Decl. ¶ 24, Ex. G.)  Plaintiff does not assert

that he followed up with McLaughlin within ten days, as required under the IRM.  In fact, at his

deposition, Plaintiff stated that he never personally tried to ship the returns because "[i]t's the

secretary's job."  (Tr. 121:12-22; Pl.'s 56.1 Stmt. ¶ 35.)  He further stated that he was "not

aware" that he had to complete a Form 3210 when he shipped the cases because he had "never

been in the position" of having to ship cases and that he "never request[s] a return receipt . . .

because [he] didn't think it was necessary."  (Tr. 126:9-15; 121:10-11; 122:21-123:2.)

McLaughlin recounted that she ultimately worked with Plaintiff to reconstruct and close the

cases.  (Pl.'s Ex. P, at 14.)  Plaintiff has presented no allegations or evidence disputing

McLaughlin's recollection.

### 7. Processing of Plaintiff's Travel Voucher

Because much of an IRS field agent's work is done outside of the office, IRS employees

complete a "locator," which is a calendar that identifies where the agent intends to be during the

coming months.  (McLaughlin Decl. ¶ 25; Def.'s 56.1 Stmt. ¶ 41; Pl.'s 56.1 Stmt. ¶ 41.)  The

term "flexi" means that the employee will not be traveling but will work from home that day.

(McLaughlin Decl. ¶ 25; Def.'s 56.1 Stmt. ¶ 42; Pl.'s 56.1 Stmt. ¶ 42.)  If the employee's

schedule changes, the employee must go into his locator to update his records.  (McLaughlin

Decl. ¶ 25; Def.'s 56.1 Stmt. ¶ 43; Pl.'s 56.1 Stmt. ¶ 43.)  When seeking reimbursement for

travel, the employee must submit his travel voucher, along with a copy of his locator to his

supervisor.  (McLaughlin Decl. ¶ 26.)  If there is a discrepancy, the supervisor will ask the

employee to review the discrepancy and update the locator.  (*Id*.)

Plaintiff contends that after he submitted a travel voucher on July 25, 2005, McLaughlin

accused him of submitting a false travel voucher, and she delayed processing the voucher for two

weeks, until August 9, 2005, despite "IRS [policy] . . . that travel vouchers must be approved

within 3 days of receipt."  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s

Mem.") 4; Compl. ¶ 8.n.)  McLaughlin states that she did not approve Plaintiff's travel voucher

immediately because there was a discrepancy between his locator and his travel voucher.

(McLaughlin Decl. ¶ 27.)  Accordingly, McLaughlin sent Plaintiff an e-mail stating the

following:

> In the process of approving all travel vouchers in the group, I
> match the locator to the travel voucher.  Your travel voucher for
> the period 5/17/05-7/25/05 has days where you charged travel but
> show flexi as your location on your locator.  These days are
> 6/16/05, 6/17/05, 6/21/05 and 6/22/05.  Please research your
> records and correct your locator or travel voucher, whichever is
> applicable.  Please send me the corrected locator and/or travel
> voucher so that I may sign your TRAS voucher.  Thank you.

(*Id*. Ex. H.)  After receiving McLaughlin's e-mail, Plaintiff submitted a revised locator by fax on

July 28, 2005.  (*Id*. ¶ 28.)  McLaughlin received the revised locator, and the travel voucher was

approved two weeks later, on August 9, 2005.  (Pl.'s Mem. 4.)

### 8. Plaintiff's TIGTA Complaint and Subsequent Suspension

On May 2, 2005, Plaintiff voluntarily participated in a classification detail in Holtsville,

New York to classify tax returns for an audit.[5]  (Def.'s 56.1 Stmt. ¶ 1; Pl.'s 56.1 Stmt. ¶ 1.)  Prior

to beginning the classification detail, Plaintiff received an e-mail written by Cheryl Martel

---

[5] A "'classification detail' involves a number of RAs who volunteer to report to a
worksite away from their [POD] for the purpose of reviewing Federal income tax returns to
determine whether the return should be accepted as filed or selected for audit."  (Def.'s Ex. D
(Decision of the Merit Systems Protection Board Reviewing Pl.'s Suspension, dated June 15,
2007), at 4.)

("Martel"), IRS Classification Section Chief, that stated as follows:

> I've booked a block of rooms at the Holtsville Residence Inn.
> Telephone number 631-475-9500.  Ask for Jen in Sales and the
> rooms are booked under IRS Classification.  The rate is $126 a
> night and the per diem is $43.  The hotel is 3 miles from the
> campus and you don't have to get on the highway.  It's all back
> roads.

(McLaughlin Decl. Ex. E.)  Plaintiff opted not to stay at the Residence Inn.  (Tr. 34:20-35:10.)

When Plaintiff began the classification detail, he was involved in a dispute with classification

detail manager John Roche ("Roche") over the working hours of the detail.  (Pl.'s Ex. G (Letter

from U.S. Office of Special Counsel to Plaintiff, dated Oct. 25, 2006), at 2; Pl.'s Ex. X (Mem.

from John Roche regarding the classification detail, dated May 9, 2006).)  According to Roche,

Plaintiff "became disruptive in the work area" after the dispute.  (*Id*.)  Roche claims that he

instructed Plaintiff to call McLaughlin, but Plaintiff refused to take instructions from Roche.

(*Id*.)  Plaintiff was ultimately removed from the classification detail.  (McLaughlin Decl. ¶ 20;

Pl.'s 56.1 Stmt. ¶ 5; Def.'s 56.1 Stmt. ¶ 5.)

In mid-May 2006, Plaintiff sent a letter to the Treasury Inspector General for Tax

Administration ("TIGTA") and the IRS Board of Employee Professional Responsibility

("BEPR") alleging that Martel committed a violation of law, rule, or regulation by sending the

e-mail about the block of rooms she had set aside at the Residence Inn.  (Pl.'s Ex. G, at 2.)

Plaintiff claimed that Martel "begged [Plaintiff] to change [his] room reservations" and that

"Martel's insistence that [he] change [his] room reservations to a hotel that she had booked

violated IRS regulations."  (*Id*.)  On July 11, 2005, Smith proposed that Plaintiff be suspended

for fifteen days for making false and malicious statements about a manager and behaving

disrespectfully toward Roche, an IRS supervisor.  (*Id*.)  On August 15, 2005, Plaintiff filed a

written response to the proposal.  (Def.'s Ex. D, at 2.)  On September 21, 2005, the deciding

official sustained the charges that Plaintiff behaved disrespectfully toward a manager and

imposed a fifteen-day suspension.  (*Id*.)  Plaintiff was then suspended for fifteen days, from

October 10, 2005 through October 25, 2005.  (Tr. 90:18-24.)

On November 1, 2005, Plaintiff filed a complaint with the United States Office of Special

Counsel ("OSC") alleging that he was retaliated against for engaging in whistleblowing and

protected activity.  (Pl.'s Ex. G, at 2.)  After investigation, the OSC closed Plaintiff's

whistleblowing allegations on October 25, 2006, determining that "it [was] unlikely that the IRS

suspended [Plaintiff] based on [his] involvement with protected activity."  (*Id*. at 3.)  Plaintiff

also raised to the OSC his claim of discrimination based on race and national origin, but the OSC

did not take action on such allegations "as they are more appropriately resolved through the EEO

process."  (*Id*.)

### 9. Disruption to Plaintiff's Remote Access

Plaintiff alleges that he was discriminated and retaliated against when his remote access

to the IRS computer system was disabled from October 2005 through November 2005.  (Compl.

¶ 8.o.)  It is IRS policy to restrict computer access of employees who are suspended.

(McLaughlin Decl. ¶ 30.)  Plaintiff's remote access to the IRS computer system was disabled on

October 12, 2005, two days after his suspension began.  (Tr. 98:2-99:4; Pl.'s Ex. P, at 2.)  After

Plaintiff's fifteen-day suspension ended, he was still unable to log on to the IRS system from his

home computer.  (McLaughlin Decl. ¶ 30; Pl.'s Ex. P, at 2.)  Though he did have computer

access in the IRS office, Plaintiff needed remote access because he often worked in the field or at

home and was present in the office only a few times a month.  (Def.'s 56.1 Stmt. ¶ 16; Pl.'s 56.1

Stmt. ¶ 16.)

Plaintiff notified McLaughlin of the problem, and McLaughlin contacted the IT

Department.  (McLaughlin Decl. ¶ 31.)  The IT Department advised McLaughlin that the IRS

had recently converted to a new remote access system, and Plaintiff was still trying to access the

IRS server using the old system.  (McLaughlin Decl. ¶ 31; Pl.'s Ex. P, at 2.)  The IT Department

also explained that Plaintiff had not submitted a Form 5081 to request an account and password

for the new system, despite having been informed of the need to do so in September 2005.

(McLaughlin Decl. Exs. I & J.)  Although Plaintiff alleges that McLaughlin intentionally failed

to "forward the e-mail [regarding the new system] to Plaintiff" (Pl.'s Mem. 10), it is clear on the

face of the e-mail that information about the new remote access system was sent to "[a]ll IRS

[e]mployees" (McLaughlin Decl. Ex. I).  In any event, Plaintiff's remote access to the IRS

computer system was ultimately restored before December 2005.  (Compl. ¶ 8.o.)

### 10. Non-Assignment to Managerial Duties

In Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary

Judgment, he alleges for the first time that the IRS failed to promote him by refusing to assign

him managerial duties.[6]  (Pl.'s Mem. 6.)  Plaintiff claims that he requested managerial duty

---

[6] As it is obligated to do, the Court has construed Plaintiff's pro se pleadings liberally.
*See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (explaining that a court must read a pro
se litigant's supporting papers liberally, interpreting them "to raise the strongest arguments that
they suggest" (internal quotation marks omitted)).  Here, although Plaintiff did not explicitly
raise this allegation in his Complaint, the form Complaint completed by Plaintiff did allege
discrimination based on a failure to promote.  Accordingly, no prejudice will result from the
Court's consideration of these claims.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569 (2d Cir.
2000) ("Under Fed. R. Civ. P. 15(b), a district court may consider claims outside those raised in
the pleadings so long as doing so does not cause prejudice.").

between March and September 2005 "to obtain some experience to become a manager."[7]  (*Id.*)

_____

[7] In addition to alleging non-assignment to managerial duties, Plaintiff also alleges that he has been passed over for promotions based on his race.  (Pl.'s Mem. 2-3.)  Plaintiff claims that he applied and was rejected for promotions in May 2001, March 2003, June 2003, November 2003, February 2004, September 2004, March 2007, April 2007, May 2007, and October 2007.  (Pl.'s Mem. 2-3; Pl.'s Ex. C.)  For the following reasons, none of those allegations is properly before the Court.

First, the doctrine of res judicata bars Plaintiff from re-litigating the claim that the IRS failed to promote him in May 2001, as that claim has already failed in a prior action.  *See Gelin v. Snow*, No. 02-CV-9641, 2005 WL 2456742, at *8 (S.D.N.Y. Sept. 30, 2005) (granting summary judgment for Defendant on Plaintiff's failure to promote claim based on the IRS's failure to promote plaintiff in 2001).  Second, all claims based on the IRS's alleged failure to promote Plaintiff prior to July 1, 2005 are time barred.  Under applicable EEOC regulations, a federal employee claiming a violation of Title VII must first consult a counselor at his agency's EEO office within forty-five days of the alleged discriminatory act.  *See* 29 C.F.R. § 1614.105(a)(1).  Failure to seek EEO counseling within the requisite time period results in a claim being time barred.  *See, e.g.*, *Boos v. Runyon*, 201 F.3d 178, 181 (2d Cir. 2000); *Milano v. Astrue*, No. 05-CV-6527, 2008 WL 4410131, at *28 (S.D.N.Y. Sept. 26, 2008); *Cherry v. Potter*, No. 04-CV-1578, 2005 WL 1085119, at *3 (S.D.N.Y. May 5, 2005).  Here, Plaintiff first sought EEO counseling on August 15, 2005, and he filed with the Treasury Department the first formal complaint that forms the basis for this action on September 26, 2005.  (Compl., Attach 1 ("Treasury Dep't Final Agency Decision, IRS-05-0319-F") A-1.)  Thus, any alleged adverse actions that occurred before July 1, 2005, including the alleged failures to promote in May 2001, March 2003, June 2003, November 2003, February 2004, and September 2004, are time barred.  Although the forty-five day time limit is subject to waiver and to equitable tolling, Plaintiff has not shown that either waiver or equitable tolling is warranted, as he has neither argued nor presented evidence to show that his tardiness should be excused.  *See, e.g.*, *Boos*, 201 F.3d at 185 (explaining that "[t]he burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff" and that plaintiff "failed to satisfy her burden of raising a genuine issue of material fact concerning the appropriateness of equitable tolling."); *Williams v. Potter*, No. 06-CV-8258, 2007 WL 2375818, at *5 (S.D.N.Y. Aug. 14, 2007) (noting that "[t]olling of the time limit is granted when "'rare and exceptional circumstances'" prevented a plaintiff from filing on time" and denying tolling or waiver based on plaintiff's failure to show that equitable tolling was warranted under the circumstances); *Jafri v. Rosenfeld*, No. 04-CV-2457, 2005 WL 991784, at *6-7 (S.D.N.Y. Apr. 26, 2005) (refusing to waive the time limit where plaintiff did not argue or show "that extenuating circumstances prevented him from complying" and declining to equitably toll the time limit where the plaintiff did not show that his failure to comply with the time limit "was anyone else's fault"); *Cherry*, 2005 WL 1085119, at *3 (holding that equitable tolling was inapplicable because the "[p]laintiff has shown no ground to excuse her tardiness.").

Plaintiff also cannot present his failure to promote claims related to 2007, as those claims have not been administratively exhausted.  "Under Title VII and the applicable EEOC regulations, a federal employee who claims to have been subjected to discrimination . . . must

McLaughlin contends that Plaintiff requested managerial duty "for the first and only time" on March 28, 2005.  (Pl.'s Ex. P, at 15.)  Defendant does not dispute Plaintiff's claim that he was not assigned managerial duties.  (*Id.*)  Rather, Defendant contends that Plaintiff was not assigned managerial duties for the following reasons:

> [Plaintiff] would not come to the New Windsor or Poughkeepsie PODs.  When asked to attend group or mandatory meetings [Plaintiff] responded 'I will not attend the group meeting due to long travel.'  [Plaintiff] did not attend any group meetings or mandatory meetings in New Windsor while in [McLaughlin's] group.  He was allowed to attend the mandatory meetings in White Plains with one of the examination groups located there and he was sent the minutes and handouts from the group meetings.  [Plaintiff] would have been allowed mileage and travel time from his home to attend the meetings.  Other agents in the group traveled long distances from their homes and were able to attend the meetings.  Not all of [McLaughlin's] agents are located in [her] POD.  To act as manager the acting agent has to come to the POD to close cases.  Since [Plaintiff] would not come to the POD he could not act.  Next, in May 2005, [Plaintiff] was involved in a conduct problem which resulted in a [fifteen-] day suspension in October 2005.

(*Id.*)

### 12. Failure to Notify of Vacancy

Plaintiff alleges that his supervisors failed to notify him of two vacancies in the Large and Mid-Size Business Division ("LMSB") in the White Plains POD, which became available in

---

timely exhaust all available administrative remedies prior to filing suit in federal court." *Moultrie v. Potter*, No. 04-CV-6887, 2006 WL 1495234, at *4 (S.D.N.Y. May 31, 2006).  "Only if the matter is not resolved through the administrative process after receipt of a final agency decision may a plaintiff commence a district court suit."  *Burke v. Gutierrez*, No. 04-CV-7593, 2006 WL 89936, at *11 (S.D.N.Y. Jan. 12, 2006).  As the Complaint in this lawsuit was filed on October 25, 2006 – several months *before* Plaintiff alleges that the IRS failed to promote him in 2007 – it is clear that Plaintiff could not have administratively exhausted these claims prior to filing this lawsuit, and he has not asserted that he should be allowed to amend his Complaint because he has administratively exhausted these claims since he initiated this action.  Accordingly, Plaintiff cannot now pursue those claims.

October 2005 and May 2005.  (Compl. ¶ 8.p-8.q.)  The IRM requires that "all promotion opportunity notices . . . be posted in a manner that will afford . . . employees the opportunity to see them."  IRM § 6.335.1.12.1.  Plaintiff does not dispute that the IRS posts all vacancy announcements both internally on an internal website, know as Career Opportunities Lists, and externally on the "USA JOBS" website.  (McLaughlin Decl. ¶ 32; Pl.'s Ex. O, at 2.)  In addition, vacancies are listed in a "hard copy of job announcements" available in each POD.  (Pl.'s Ex. O, at 2.)  The Court has reviewed the IRM, and it does not contain any provisions that obligate IRS managers to personally notify subordinates about vacancy announcements.  According to McLoughlin, the IRS does not impose on managers any "obligation to routinely notify employees about vacancy announcements," and it "has not been the policy for managers to notify employees on a regular basis" regarding vacancies.  (*Id.*)

B. Procedural History

On September 26, 2005, after seeking counseling ("EEO counseling") at the Treasury Department's ("Treasury") equal employment office on August 15, 2005, Plaintiff filed a formal complaint with Treasury.  (Treasury Dep't Final Agency Decision, IRS-05-0319-F A-1.)  Pursuant to that complaint, Treasury investigated Plaintiff's allegations that between September 2004 and May 2006 he was subjected to harassment based on his race and national origin and retaliation for prior EEO activity.[8]  (*Id.*)  On January 20, 2006, after receiving EEO counseling on October 3, 2005, Plaintiff filed another administrative complaint with Treasury, alleging that his suspension in October 2005 was the product of discrimination based on his race and national

---

[8] Treasury appears to have investigated conduct that allegedly occurred after the filing of his formal complaint, as Plaintiff filed his formal complaint nine months before the alleged occurrence of some of the conduct that Treasury investigated.

origin and retaliation for prior EEO activity.  (Compl. Attach 3 ("Treasury Dep't Final Agency Decision, TD 06-2185M") C-1.)  On October 4, 2006, in two separate decisions, Treasury concluded that both of Plaintiff's complaints lacked merit and that "a finding of no discrimination or reprisal is appropriate."  (Treasury Dep't Final Agency Decision, TD 06-2185M C-8; Treasury Dep't Final Agency Decision, IRS-05-0319-F A-11.)  Plaintiff appealed Treasury's decision on his second complaint to the Merit Systems Protection Board ("MSPB") on October 10, 2006, alleging that Plaintiff's supervisors acted with discriminatory and retaliatory motives when they suspended him in October 2005.  (Def.'s Ex. D, at 1, 4.)  While the MSPB appeal was pending, Plaintiff, proceeding pro se, filed his Complaint in this case on October 25, 2006.[9]

The MSPB issued its decision on June 15, 2007, affirming Plaintiff's suspension and concluding that Plaintiff failed to make a prima facie case of discrimination or retaliation based on the suspension.  (*Id.* at 33.)  The MSPB decision became final on July 20, 2007.  (*Id.*)  On August 17, 2007, Plaintiff filed a second action in this Court, raising the same allegations that he had previously raised before the MSPB and reasserting several allegations raised in his Complaint in this case.  Compl. ¶ 8, *Gelin v. Geithner*, No. 07-CV-7345 (S.D.N.Y. filed Aug. 17, 2007).  This Court stayed the proceedings in Plaintiff's second filed action, *see Gelin*, 07-CV-7345 (order granting stay) (Dkt. No. 5), pending the resolution of the present motion for summary judgment, which was filed by Defendant on October 5, 2007.[10]

---

[9] This case was originally assigned to Judge Colleen McMahon, but it was reassigned to this Court on August 6, 2007.

[10] Defendant's motion papers included a Notice to Pro Se Litigant Opposing Motion for Summary Judgment, as required under Local Rule 56.2.

<u>II. Discussion</u>

<u>A. Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986).  In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Liberty Lobby*, 477 U.S. at 255.  The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination.'"  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  Nevertheless, courts

17

may grant summary judgment for a defendant in an employment discrimination case where the plaintiff relies on "conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Tojzan v. New York Presbyterian Hosp.*, No. 00-CV-6105, 2003 WL 1738993, at *4 (S.D.N.Y. Mar. 31, 2003); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 465-66 (2d Cir. 2001) (noting that courts are not to "'treat discrimination differently from other ultimate questions of fact'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000))); *Gelin v. Snow*, No. 02-CV-9641, 2005 WL 2456742, at *5 (S.D.N.Y. Sept. 30, 2005) (explaining that while courts should be cautious about granting summary judgment in the employment discrimination context, "a court may grant a defendant's motion for summary judgment . . . where the plaintiff relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct") (internal quotation marks omitted)).

Finally, the Court is mindful that "[t]he submissions of a pro se party should be held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 577 (S.D.N.Y. 2008) (quoting *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam)); *see also Salahuddin v. Coughlin*, 999 F. Supp 526, 535 (S.D.N.Y. 1998) (recognizing that pro se plaintiffs are to be given "special latitude on summary judgment motions" (internal quotation marks omitted)).  Therefore, courts must read a pro se litigant's supporting papers liberally, interpreting them "to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation marks omitted).  This does not, however, "relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d

18

46, 50 (2d Cir. 2003) (internal quotation marks omitted); *see also Monterroso*, 591 F. Supp. 2d

at 577 ("[P]roceeding pro se does not otherwise relieve a litigant from the usual requirements of

summary judgment, and a pro se party's bald assertion, unsupported by evidence, is not

sufficient to overcome a motion for summary judgment" (quoting *Cole v. Artuz*, No. 93-CV-

5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)) (internal quotation marks omitted)).

### B. Plaintiff's Title VII Claims

Under the burden shifting analysis prescribed by *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973), "the plaintiff bears the initial burden of establishing a prima facie case of

discrimination [under Title VII].  If the plaintiff does so, the burden shifts to the defendant to

articulate 'some legitimate, non-discriminatory reason' for its action.  If such a reason is

provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may

still prevail by showing, without the benefit of the presumption, that the employer's

determination was in fact the result of racial discrimination."  *Holcomb*, 521 F.3d at 138 (quoting

*McDonnell Douglas*, 411 U.S. at 802) (internal citations omitted); *see also Abdu-Brisson*, 239

F.3d at 466.  "To do so, Plaintiff must produce 'not simply some evidence, but sufficient

evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by

the defendant were false, and that more likely than not discrimination was the real reason for the

employment action.'"  *Pacheco v. New York Presbyterian Hosp.*, No. 02-CV-9438, --- F. Supp.

2d ----, 2009 WL 55886, at *6 (S.D.N.Y. Jan. 9, 2009) (quoting *Weinstock v. Columbia Univ.*,

224 F.3d 33, 42 (2d Cir. 2000)).  Accordingly, "once an employer gives an explanation for the

action taken and the plaintiff attempts to refute it, the Court's responsibility is to examin[e] the

entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading

the trier of fact that the defendant intentionally discriminated against the plaintiff." *Id*. (internal

quotation marks omitted) (alterations in original); *see also Reeves*, 530 U.S. at 143.

Plaintiff suggests three bases for finding a violation of Title VII:  (1) employment

discrimination based on his race and national origin; (2) employment retaliation; and (3) a hostile

work environment.

<u>1. Discrimination Based on Race and National Origin</u>

To satisfy his burden of establishing a prima facie case of discrimination, Plaintiff must

produce evidence that shows that:  (1) he belongs to a protected class; (2) he was qualified for

his position; (3) he suffered an adverse employment action; and (4) the circumstances

surrounding the adverse employment action give rise to an inference of discrimination.  *See*

*Holcomb*, 521 F.3d at 138; *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).

Plaintiff's burden in establishing these elements has been described as "minimal," *McGuinness*,

263 F.3d at 53, "not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253

(1981), and "de minimis," *Abdu-Brisson*, 239 F.3d at 467.

Here, the first and second elements of Plaintiff's prima facie case are not in question.

There is no dispute that Plaintiff, as a black male of Haitian descent, is a member of a class

protected under Title VII.  *See Paul v. Wyeth Pharm., Inc.*, No. 07-CV-950, 2008 WL 552554, at

*9 (S.D.N.Y. Feb. 28, 2008) ("Plaintiff, a black male of Haitian descent, is a member of a

protected class.").  Nor is there any dispute that Plaintiff was qualified for his position as an RA.

(Def.'s Mem. 6 (stating that Plaintiff was promoted to a higher paying position at the IRS).)  *See*

*Boyd v. Presbyterian Hosp. in City of New York*, 160 F. Supp. 2d 522, 535 (S.D.N.Y. 2001)

("The second prong of a prima facie case, satisfactory job performance, is a fairly low threshold

to meet.").  Therefore, the Court's analysis focuses on whether Plaintiff can establish the third

and fourth elements of the prima facie test.

### a. Adverse Employment Action

Defendant contends that Plaintiff has failed to cite any "incidents that constitute adverse

employment actions" for discrimination or retaliation purposes.  (Def.'s Mem. 17.)  "An adverse

employment action is 'a materially adverse change in the terms and conditions of employment.'"

*Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. New York City*

*Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)); *see also Galabya v. New York City Bd.*

*of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("A plaintiff sustains an adverse employment action

if he or she endures a 'materially adverse change' in the terms and conditions of employment.").

To constitute a "materially adverse change," there must be "a change in working conditions . . .

[that is] more disruptive than a mere inconvenience or an alteration of job responsibilities."

*Mathirampuzha*, 548 F.3d at 78 (quoting *Sanders*, 361 F.3d at 755); *see also Schiano v. Quality*

*Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) ("'Examples of materially adverse changes

include termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices unique to a particular situation.'" (quoting *Fairbrother v. Morrison*, 412 F.3d 39,

56 (2d Cir. 2005))).  The Supreme Court has held that adverse employment actions include

"hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

742, 761 (1998).

Plaintiff has cited ten incidents or circumstances that he contends constitute adverse

employment actions:

    (1)     his transfer from the White Plains POD to the New Windsor POD;

    (2)     his assignment to several cases that he had previously classified;

    (3)     the inaction on his allegation of harassment by Marinucci;

    (4)     his assignment to twenty-one partnership cases;

    (5)     the disappearance of his closed cases;

    (6)     the delayed processing of his travel voucher;

    (7)     the fifteen-day suspension in October 2005;

    (8)     the disruption of his remote access to the IRS computer system from October to November 2005;

    (9)     the alleged failure to assign him managerial duties; and

    (10)    the alleged failure to notify him of vacancies in the LMSB group.

(Compl. 4, ¶ 8; Pl.'s Mem. 6.)  The Court finds that of these alleged incidents and circumstances, the only items that arguably constitute adverse employment action are items (7), (8), and (9):  the fifteen-day suspension in October 2005; the disruption to Plaintiff's remote access from October through November 2005; and the alleged failure to assign Plaintiff managerial duties.  The remaining allegations, even when viewed in totality, constitute the sort of inconsequential inconveniences that, as a matter of law, cannot give rise to a Title VII discrimination claim. Beyond Plaintiff's bare assertions, there is nothing to suggest that Plaintiff experienced "some attendant negative result, [such as] a deprivation of a position or opportunity" based on these incidents.  *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 354 (S.D.N.Y. 2006) (internal quotation marks omitted) (alterations in original).

    For example, neither the loss of Plaintiff's closed cases nor the delayed processing of his

travel voucher had any affect on his working conditions.  Both incidents were mere

"inconveniences," which simply "do not constitute adverse employment actions."  *Hill*, 467

F. Supp. 2d at 354 ("[S]upervisor's demand that [Plaintiff] produce an airline ticket to verify her

request for vacation" was an inconvenience, not an "adverse employment action"); *see also Lee

v. New York State Dep't of Health*, Nos. 98-CV-5712 & 99-CV-4859, 2001 WL 34031217, at

*17 (S.D.N.Y. Apr. 23, 2001) (holding that delay in receipt of overtime payment was not an

adverse employment action); *Sprott v. Franco*, No. 94-CV-3818, 1997 WL 79813, at *13 n.5

(S.D.N.Y. Feb. 25, 1997) ("Any delay in receiving the paycheck was a mere inconvenience to

plaintiff.").  Plaintiff's supervisors, in each instance, worked with Plaintiff to resolve the incident

at issue without consequence to Plaintiff.  Indeed, Plaintiff's cases were eventually closed, and

he was reimbursed for his travel.  Particularly given that the evidence in the record – including

evidence submitted by Plaintiff – suggests that both incidents arose because of Plaintiff's own

mistakes, the Court cannot conclude that either of these incidents constitute an adverse

employment action.

Plaintiff has also failed to show that his assignment to cases that he had previously

classified resulted in any negative change to his working conditions.  As Plaintiff concedes, he

never actually worked on these cases because his supervisor reassigned him new work when she

became aware of the conflict of interest.  Based on the facts in the record, this incident was not

"more disruptive than a mere inconvenience," *Mathirampuzha*, 548 F.3d at 78, if even that, and

does constitute an adverse employment action.

Nor were Plaintiff's working conditions materially affected by his assignment to twenty-

one partnership cases.  Plaintiff's "subjective dissatisfaction with assignments" simply does not

rise to the level of adverse employment action, *Harrison v. New York City Off-Track Betting Corp.*, No. 99-CV-6075, 2001 WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001); *see also Antonmarchi v. Consol. Edison Co.*, No. 03-CV-7735, 2008 WL 4444609, at *14 (S.D.N.Y. Sept. 29, 2008) ("Unfavorable hours do not constitute an adverse employment action for the purposes of Title VII."); *Young v. Rogers & Wells LLP*, No. 00-CV-8019, 2002 WL 31496205, at *6 (S.D.N.Y. Nov. 6, 2002) ("Giving an employee more work . . . is not an adverse employment action."), particularly given that Plaintiff returned the cases that he was unable to handle and was not subject to any consequence for doing so.[11]

There is also insufficient evidence to demonstrate that Defendant's failure to notify Plaintiff by e-mail of LMSB vacancies negatively affected Plaintiff's employment.  The IRS publishes all vacancy announcements on its internal intranet, on the publicly available USA JOBS website, and in hard copy at the individual PODs.  Plaintiff has failed to substantiate his claim that Defendant had an additional affirmative obligation to notify him by e-mail of these vacancies.  Defendant, on the other hand, has offered evidence that no such obligation existed.  Therefore, Defendant's alleged failure to personally notify Plaintiff of open positions that were already posted and accessible to him is clearly insufficient to constitute an adverse employment action.[12]

---

[11] Moreover, Defendant has presented unrefuted evidence that Plaintiff's assignment to these cases was for the legitimate nondiscriminatory reason that he was the most senior RA under McLaughlin's supervision in White Plains, and the most senior RAs are assigned the more complicated returns.  (McLaughlin Decl. ¶¶ 4-7.)  Plaintiff has presented no evidence to rebut Defendant's explanation.

[12] The Court notes that even if this alleged failure did constitute an adverse employment action, there is nothing to suggest that such an action was aimed at Plaintiff, as Plaintiff has failed to present evidence (or allegations) that any other employee was personally notified of

In addition, there is no evidence in the record that Plaintiff's employment was negatively affected by the alleged inaction on Plaintiff's allegation regarding Marinucci.  Even if, as Plaintiff alleges, he was required to interact with Marinucci after the incident, such interaction hardly qualifies as "an intolerable alteration of the plaintiff's working conditions . . . [that] . . . substantially interfere[s] with or impair[s] his ability to do his job."  *Mathirampuzha*, 548 F.3d at 79 (internal quotation marks and citations omitted).  Indeed, the record suggests that Plaintiff's allegation of harassment by Marinucci was greatly exaggerated.  As Plaintiff concedes, one of Marinucci's duties as the Group Clerk was to send periodic reminders to all agents in McLaughlin's group to remind them to submit monthly reports.  (Pl.'s 56.1 Stmt. ¶ 31.)  Her attempt to send such a periodic reminder to Plaintiff resulted in the mutual disagreement that is reflected in their subsequent e-mail exchange.  Although Plaintiff may have found it unpleasant to interact with Marinucci following this disagreement, it is well established that "Title VII is not 'a general civility code.'"  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).  "[N]ot everything that makes an employee unhappy is an actionable adverse action."  *Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 327 (S.D.N.Y. 2005) (internal quotation marks omitted).

Finally, Plaintiff cannot show that his alleged transfer constituted an adverse employment action.  "[A] transfer can, when representing a significant change in the nature of [the employee's] work, 'constitute interference with a condition or privilege of employment

_____

such vacancies.  Thus, the failure to personally notify employees of vacancies would affect all employees, regardless of race or national origin. *Cf. Lamb v. Henderson*, No. 98-CV-2756, 1999 WL 596271, at *3 (S.D.N.Y. Aug. 9, 1999) (finding that failure to post vacancies could not form the basis for an age discrimination suit, as a failure to post job vacancies would affect all employees equally, regardless of their age).

adversely affecting [the employee's] status within the meaning of Title VII."  *Boyd*, 160 F. Supp. 2d at 536 (quoting *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir.1980)) (original brackets omitted). Nevertheless, "[a] transfer that is truly lateral and involves no significant changes in an employee's conditions of employment is not an adverse employment action regardless of whether the employee views the transfer negatively." *Watson v. Paulson*, 578 F. Supp. 2d 554, 563 (S.D.N.Y. 2008); *see also Galabya*, 202 F.3d at 641 ("[P]laintiff must show that the transfer created a materially significant disadvantage." (internal quotation marks omitted)); *Patrolmen's Benevolent Ass'n v. City of New York*, 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999) ("The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion." (internal quotation marks omitted)). For example, "if an employee earns the same salary, has the same benefits, works the same hours and has the same opportunities for promotion following a transfer then there is no adverse employment action . . . ." *Watson*, 578 F. Supp. 2d at 564 (internal quotation marks and alterations omitted).  Here, Plaintiff's transfer does not constitute a "significant change in the nature of [Plaintiff's] work," *Boyd*, 160 F. Supp. 2d at 536, as the evidence suggests that the transfer was "truly lateral," *Watson*, 578 F. Supp. 2d at 563.  Indeed, the evidence presented by both Parties demonstrates that Plaintiff's transfer was nominal only – at all times Plaintiff continued to work in the White Plains POD.  Morever, Plaintiff has presented nothing to suggest that his benefits, hours, or opportunities for promotion were remotely affected by the transfer. As such, Plaintiff has not shown that this nominal transfer constituted an adverse employment action.

Thus, of the ten examples cited by Plaintiff, only three – the fifteen-day suspension in

October 2005, the disruption to Plaintiff's remote access from October through November 2005, and the alleged failure to assign Plaintiff managerial duties – arguably qualify as adverse employment actions.  Each of these three actions caused changes in the terms and conditions of Plaintiff's employment that were arguably significant enough to qualify as materially adverse.

Plaintiff's fifteen-day suspension meets this standard, as it materially altered his working conditions by prohibiting him from coming into work, interrupting his access to the IRS computer systems, and left him without pay for fifteen days.  *See Garcia v. New York City Admin. of Children's Servs.*, No. 03-CV-5271, 2007 WL 2822153, at *5 (S.D.N.Y. Sept. 27, 2007) (accepting that alleged suspension constituted adverse employment action); *see also Hill*, 467 F. Supp. 2d 336 at 355-56 (determining that ten-day suspension was an adverse employment action that materially altered the plaintiff's working conditions).

The disruption to Plaintiff's remote access from October through November 2005 also arguably qualifies as an adverse employment action, as it continued even after Plaintiff's suspension had ended, thereby interfering with Plaintiff's ability to access the IRS computer system while at home or working in the field.  As it is undisputed that Plaintiff's position as an RA required him to spend a good portion of his time working at home or in the field (Def.'s 56.1 Stmt. ¶ 16; Pl.'s 56.1 Stmt. ¶ 16), it is at least arguable that suspension of his remote access materially affected his employment by making it more difficult for him to complete his work. *See Nakis v. Potter*, 422 F. Supp. 2d 398, 420 (S.D.N.Y. 2006) (finding denial of computer training to be adverse action where it would bear on opportunities for professional growth and advancement); *cf. Terry v. Ashcroft*, 336 F.3d 128, 145 (2d Cir. 2003) (holding in context of retaliation claim under Title VII that suspension of use of government-owned vehicle was

materially adverse where "it appears that to fully engage in his . . . position [plaintiff] would have had to perform field work").

Finally, the alleged denial of a promotion to a position with managerial duties is well recognized as an adverse employment action under Title VII. *See Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (holding that allegation that plaintiff was not promoted based on impermissible factors "comfortably satisfy the . . . requirement of an adverse employment action"); *Collins v. Cohen Pontani Lieberman & Pavane*, No. 04-CV-8983, 2008 WL 2971668, at *12 (S.D.N.Y. July 31, 2008) ("It is well-established that a failure to promote constitutes an adverse employment action.").

### b. No Inference of Discrimination

Even if Plaintiff did establish that he suffered the three adverse employment actions described above, he fails to establish a prima facie case because he has not met his minimal burden of showing that any of the incidents he cites "occurred under circumstances that give rise to an inference of discrimination." *Chertkova v. Connect. Gen. Life Ins. Co.*, 92 F.3d 81, 92 (2d Cir. 1996). Here, Plaintiff has neither direct nor indirect evidence of discrimination.

"[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision." *Id*. at 91. "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race" or national origin were treated more favorably, *Debidat v. Marriott Int'l, Inc*., 580 F. Supp. 2d 300, 305 (S.D.N.Y. 2008), by showing that there were "remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," *Chertkova*, 92 F.3d at 91, or by proving that there were other "circumstances giving rise to an inference of

discrimination on the basis of plaintiff's" race or national origin, *Farias v. Instructional Sys. Inc.*, 259 F.3d 91, 98 (2d Cir. 2001).

Conclusory and speculative allegations will not suffice to demonstrate discriminatory intent.  Rather, Plaintiff "must point to facts that suggest" that the adverse action was motivated, at least in part, by discriminatory animus.  *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745, 753 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 461 (2d Cir. 1999); *see also Anderson v. Port Auth. of New York & New Jersey*, No. 04-CV-4331, 2009 WL 102211, at *4 (S.D.N.Y. Jan. 12, 2009) ("[M]ere conclusory allegations of discrimination will not defeat a summary judgment motion; a plaintiff in a discrimination case must proffer 'concrete particulars' to substantiate his claim."); *Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381, 399 (S.D.N.Y. 2008) (finding no inference of discrimination because Plaintiff presented no evidence supporting discriminatory animus).  "Although the burden of meeting the prima facie case is 'de minimis,' Plaintiff must adduce some admissible evidence that would support [his] claims."  *Hill*, 467 F. Supp. 2d at 356.

### i. Plaintiff's Fifteen-Day Suspension

Plaintiff has not submitted any evidence whatsoever to suggest that his fifteen-day suspension in October 2005 occurred under circumstances giving rise to discrimination.  For example, he has not presented evidence that any discriminatory remark was made either by Smith, the supervisor who recommended the fifteen-day suspension, or by any other of Plaintiff's supervisors.  While Plaintiff alleges in his Memorandum of Law that an IRS Group Manager, Maryann Becker ("Becker"), made a negative comment about his knowledge of the English language (Pl.'s Mem. 23, 26), this allegation does not suggest that his suspension was motivated by discriminatory animus, as Plaintiff has neither alleged nor presented any evidence

that Becker was one of his supervisors, that she was in any way involved in the decision to suspend Plaintiff, or that her comments bore any weight in Plaintiff's supervisors' recommendation to suspend him.  *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark."); *see also Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162 (2d Cir. 1998) (concluding that "'stray' remarks in the workplace by persons who are not involved in the pertinent decisionmaking process" do not suffice to establish inference of discriminatory animus); *Quinby v. WestLB AG*, No. 04-CV-7406, 2007 WL 3047111, at *1 (S.D.N.Y. Oct. 18, 2007) ("Generally speaking, comments by nondecisionmakers cannot be used to establish discriminatory animus.").

In any event, Plaintiff has also not submitted any evidence to suggest that the hearing officer who sustained the charge that Plaintiff behaved disrespectfully toward a manager and who ultimately imposed the fifteen-day suspension made any discriminatory statements or harbored any discriminatory animus.  *Cf. Pjetrovic v. Merrill Lynch & Co., Inc.*, No. 03-CV-6605, 2004 WL 2725993, at *4 (S.D.N.Y. Nov. 30, 2004) ("The discriminatory animus of intermediate supervisors who have input in the decision-making process will not give rise to liability if the supervisor with final authority bases an adverse employment action exclusively on an independent evaluation.").  Further, he has not presented evidence that employees of a different race or national origin who had engaged in similar conduct were treated differently than Plaintiff.  *See Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A showing of disparate treatment . . .  is a recognized method of raising an inference of discrimination for

purposes of making out a prima facie case[, but a] plaintiff relying on disparate treatment evidence 'must show []he was similarly situated in all material respects to the individuals with whom []he seeks to compare h[im]self.'" (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Indeed, the Court notes that when Plaintiff was asked in his deposition what his basis was for believing that his suspension was the product of discriminatory animus, Plaintiff relied exclusively on his own personal speculation:

> Q: You said that [McLaughlin] assigned you 16 cases which you classified and you closed cases, she assigned you . . . 21 partnership cases, and recommended to suspend you.  Why do you believe that that's related to your race or national origin?
>
> A: Why do I believe it?  What else could it be?

(Tr. 81:21-82:10.)

> Q: And why do you believe that your suspension was race discrimination and national origin discrimination?
>
> A: There is no other way.  They had no other reason for me to be suspended.  Not only no one meet with me  – the first line manager did not meet with me to get my point of view.  The second manager did not meet with me to get my point of view.

(Tr. 58:2-8.)  The Second Circuit has rejected precisely the type of speculation Plaintiff has offered here, where he has "done little more than cite to [his] mistreatment and ask the [C]ourt to conclude that it must have been related to [his] race." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001); *see also Garvin v. Potter*, 367 F. Supp. 2d 548, 566 (S.D.N.Y. 2005) ("The plaintiff's suspicions of discrimination in the absence of any supporting evidence cannot defeat a motion for summary judgment.").  In the absence of any evidence supporting an inference of discrimination, there is simply no basis in the record for a reasonable factfinder to conclude that

Plaintiff's suspension resulted from discriminatory animus.

ii. Suspension of Plaintiff's Remote Access

Plaintiff has also failed to present any evidence (or, indeed, even to allege any facts) that suggest that the suspension of his remote access was based on discriminatory animus. Plaintiff does not dispute that the suspension of his remote access was due to his fifteen-day suspension. As discussed above, Plaintiff has submitted no evidence to suggest that the fifteen-day suspension was motivated by discriminatory animus. Likewise, he has presented no evidence suggesting a discriminatory reason behind the suspension of his computer access during the fifteen-day suspension. As noted previously, Plaintiff has neither alleged facts nor produced evidence suggesting that a discriminatory remark was made by any decisionmaker involved in imposing Plaintiff's suspension, including the decision to suspend his computer access. Plaintiff also has failed to allege facts or to submit evidence suggesting that other suspended IRS employees of a different race or national origin than Plaintiff were allowed remote access to the IRS system during their suspension.

Nor are there facts in the record which support an inference of discrimination with respect to the continued suspension of Plaintiff's remote access after the end of his fifteen-day suspension. After Plaintiff returned from his fifteen-day suspension, it is undisputed that he could not gain remote access to the IRS's system in part because the IT Department had converted the IRS to a new remote access server while Plaintiff was serving his suspension and Plaintiff did not have an account and password for the new server immediately after he finished serving his suspension. Nothing from this simple sequence of events remotely supports a discrimination claim, and Plaintiff has offered no evidence of racial animus from anyone in the

32

IT Department.

While Plaintiff asserts that McLaughlin intentionally failed to "forward the e-mail" from the IT Department advising Plaintiff of his obligation to file certain forms to gain access to the new system (Pl.'s Mem. 10), Plaintiff provides no evidence that directly or even circumstantially supports this assertion.  From the face of the IT Department's e-mail, it is clear that the e-mail was sent to "[a]ll IRS [e]mployees."  (McLaughlin Decl. Ex. I).  In any event, however, even if the Court were to assume the truth of Plaintiff's allegation, he has presented no evidence to suggest that any such failure by McLaughlin was motivated by discriminatory animus.

Thus, the record is devoid of evidence from which a factfinder could reasonably conclude that race discrimination played a part in the suspension of Plaintiff's remote access, both during and after his fifteen-day suspension.

### iii. Failure to Assign Him Managerial Duties

Furthermore, Plaintiff has failed to raise an inference of discrimination with respect to his allegations that Defendant failed to assign him managerial duties between July and October of 2005.  It is undisputed that Plaintiff asked for managerial duties at least once between March and September 2005.  (Pl.'s Ex. P, at 15.)  Yet, Plaintiff has produced no evidence suggesting the denial of these duties "occurred under circumstances that give rise to an inference of discrimination."  *Chertkova*, 92 F.3d at 92.  Again, Plaintiff has produced no evidence that any discriminatory remark was made by any of his supervisors or by any individual responsible for assigning him managerial duties.  As noted above with regard to Plaintiff's suspension, Plaintiff's allegation that Becker made a negative comment about his knowledge of the English language does not suggest that he was denied managerial duties based on discriminatory animus,

33

as Plaintiff has neither alleged nor presented any evidence that Becker was one of his supervisors, or that she was in any way involved in deciding whether to assign Plaintiff managerial duties.  *See Chuang v. T.W. Wang Inc.*, No. 04-CV-4988, 2009 WL 116906, at *6 (E.D.N.Y. Jan. 16, 2009) (holding, in context of ADEA, that plaintiff failed to show that he was fired because of his age despite evidence that a nonsupervisory coworker made remarks suggesting discriminatory animus); *cf. Pilgrim v. McGraw-Hill Cos., Inc.*, No. 07-CV-6618, --- F. Supp. 2d ----, 2009 WL 440370, at *10-11 (S.D.N.Y. Feb. 18, 2009) (denying summary judgment where coworker with hiring authority made a racially discriminatory remark, including a remark that he would not hire an African American, around the time the decision was made).

Plaintiff alleges that the only individuals who received managerial duties were "non-CPA, [] non-MBA [d]egree white [] American born [employees] with the exception of only one American born[,] non-CPA [employee]."  (Pl.'s Mem. 11.)  Plaintiff has produced evidence that two of his white coworkers, Becker and Michael Capalbo ("Capalbo"), were assigned managerial duties.  (Pl.'s Ex. W (List of Employees Assigned to Managerial Duty), at 2.)  Yet, this evidence on its own is insufficient to raise an inference of discrimination with respect to his nonassignment to managerial duties.

"[W]here a plaintiff seeks to make out [a] prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that [he] shared sufficient employment characteristics with that comparator so that they could be considered similarly situated."  *McGuinness*, 263 F.3d at 54.  Here, Plaintiff has produced no evidence to show that Becker and Capalbo were "similarly situated" to Plaintiff in all "material respects."  *Id*.  While Plaintiff has submitted evidence that shows that both Becker and Capalbo were GSL-

34

13 RAs, he has produced no evidence to show that they were similarly situated to him in terms of the quality of their performance, their disciplinary records, or other material factors relevant to deciding whether to assign managerial responsibilities.  *See Idrees v. City of New York*, No. 04-CV-2197, 2009 WL 142107, *14 (S.D.N.Y. Jan. 21, 2009) (finding no evidence of retaliatory animus based on disparate treatment where plaintiff did not "show[] he was similarly situated to [his coworker] in terms of experience or in terms of many other criteria used by the committee to evaluate and rate the candidates"); *Loucar v. Boston Mkt. Corp*., 294 F. Supp. 2d 472, 479 (S.D.N.Y. 2003) (finding coworker not similarly situated to plaintiff where coworker had significantly more experience and a stronger performance record than plaintiff).  Based on this record, a reasonable factfinder could not conclude that Plaintiff's nonassignment to managerial duties was motivated by discriminatory animus.

Thus, Plaintiff has failed to show that any of the incidents that arguably constitute adverse employment actions occurred under circumstances that raise an inference of discriminatory animus.  Therefore, Plaintiff has failed to state a prima facie case of discrimination.

### c. Defendant Has Provided Valid Reason for His Actions

Summary judgment is warranted even if Plaintiff had established a prima facie case of employment discrimination, as Defendant has provided legitimate nondiscriminatory reasons for his actions, and Plaintiff has failed to rebut those reasons.  *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 223 (2d Cir. 2004) (affirming grant of summary judgment for defendant where defendant articulated legitimate nondiscriminatory reasons for plaintiff's suspension, which plaintiff failed to rebut).

First, there is ample evidence in the record – including evidence presented by Plaintiff – that Plaintiff's fifteen-day suspension was based on his misconduct and was entirely justified. The record includes evidence that during the Holtsville classification detail, Plaintiff was involved in a dispute with the classification detail manager over his working hours and that he became "disruptive" in the working area after the dispute.  (Pl.'s Ex. G, at 2; Pl.'s Ex. X.)  *See also Diaz v. TMC Servs*., 451 F. Supp. 2d 566, 575 (S.D.N.Y. 2006) (determining that suspension was legitimate and nondiscriminatory where it was based, in part, on arguing with a supervisor). There is also evidence that suggests that Plaintiff made false statements about Martel's e-mail regarding the Holtsville classification.  (Pl.'s Ex. G, at 2.)  *See Ashjari v. NYNEX Corp*., No. 93-CV-751, 1998 WL 19995, at *4 (S.D.N.Y. Jan. 21, 1998) (holding that "making false accusations that his former supervisor was lying and badmouthing him to his fellow employees" was a valid, nondiscriminatory reason for Plaintiff's termination).  Further, Plaintiff's suspension was only imposed after a deciding official investigated and sustained these charges.  (Def.'s Ex. D, at 2.) *See Hill*, 467 F. Supp. 2d at 365 (determining that insubordination was valid nondiscriminatory reason for suspension, particularly where "the suspension decision was made by an official with no interest in the outcome").  Ultimately, on June 15, 2007, the MSPB issued an opinion affirming Plaintiff's suspension based on these charges.  (Def.'s Ex. D, at 2.)  Thus, the evidence overwhelmingly shows that there were legitimate nondiscriminatory reasons for Plaintiff's suspension.

Moreover, Defendant has also produced evidence that Plaintiff's remote access to the IRS computer system was suspended for legitimate nondiscriminatory reasons.  First, Defendant has submitted evidence that Plaintiff's remote access was suspended during his fifteen-day

suspension because it is IRS policy to restrict computer access of suspended employees. (McLaughlin Decl. ¶ 30.)  Second, Defendant has produced evidence that Plaintiff's inability to access the IRS system remotely continued after his fifteen-day suspension because of Plaintiff's failure to submit the proper forms to obtain an account name and password for the IRS's new remote access server.  (McLaughlin Decl. ¶ 31, Exs. I & J.)  Third, Plaintiff was able to access the IRS server remotely by December 2005, after he completed the necessary paperwork. (Compl. ¶ 8.o.)

Finally, the record shows that there were legitimate nondiscriminatory reasons why Plaintiff was not assigned managerial duties.  Not only had Plaintiff behaved disrespectfully toward a manager at the classification detail in May 2005, but he was subsequently suspended for fifteen days in October 2005 for that improper conduct.  (Pl.'s Ex. P, at 15.)  In addition, according to McLaughlin, Plaintiff was the only RA in McLaughlins's group who refused to attend group meetings, including mandatory meetings, which were held at the New Windsor and Poughkeepsie offices during that time period.  (*Id.*)  According to McLaughlin, Plaintiff's refusal to attend these meetings was based on his desire to avoid "long travel" between White Plains and New Windsor or Poughkeepsie.  (*Id.*)  Yet, "[o]ther agents in the group traveled long distances from their homes" or from PODs other than New Windsor or Poughkeepsie to attend the meetings.  (*Id.*)  According to McLaughlin, Plaintiff "would have been allowed mileage and travel time from his home to attend the meetings."  (*Id.*)  Defendant considered Plaintiff's refusal to travel to group meetings particularly relevant to the decision not to assign him managerial duties because one of a manager's duties is to travel to the PODs of the agents he or she manages.  (*Id.*)

37

The reasons set forth by Defendant constitute legitimate nondiscriminatory business reasons for withholding from Plaintiff managerial responsibilities.  *See, e.g.*, *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 418 (S.D.N.Y. 2006) (holding that defendant had unrebutted, legitimate nondiscriminatory reason for disciplining plaintiff where she, *inter alia*, failed to attend a required meeting); *Chi Ho Lin v. New York City Admin. for Children's Servs.*, No. 99-CV-10314, 2003 WL 21973361, at *8 (S.D.N.Y. Aug. 19, 2003) (finding that refusal to promote plaintiff based on his disciplinary history constituted legitimate nondiscriminatory reason for failure to promote).  "[P]laintiff has not responded with evidence suggesting that [D]efendant's explanations are pretextual, as required by *McDonnell Douglas*."  *Billue v. Praxair, Inc*., No. 07-CV-2359, 2008 WL 4950991, at *1 (2d Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802-04).  As Plaintiff has failed to meet his burden of production on his discrimination claims, Defendant's motion for summary judgment on these claims is granted.

### 2. Employment Retaliation Claim

Plaintiff's claim of employment retaliation also does not survive Defendant's motion for summary judgment.  To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate:  (1) that he participated in a protected activity; (2) that his employer was aware of that activity; (3) that materially adverse action occurred; and (4) that there was a causal connection between the protected activity and the adverse employment action.  *See Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006); *see also Schiano*, 445 F.3d at 608; *Bronzini v. Classic Sec. LLC*, Nos. 07-CV-11104, 08-CV-475, 2009 WL 102140, at *9 (S.D.N.Y. Jan. 15, 2009); *Auguste v. New York Presbyterian Med. Ctr.*, --- F. Supp. 2d ----, No. 06-CV-2895, 2009 WL 102214, at *4 (S.D.N.Y. Jan. 14, 2009).  Even if

38

a plaintiff can state a prima facie case of retaliation, his claim is subject to the *McDonnell*

*Douglas* burden-shifting test.  *See Terry*, 336 F.3d at 141; *see also Anderson*, 2009 WL 102211,

at *6.

Defendant does not dispute that in September 2004, Plaintiff filed a formal EEO

complaint against Smith alleging discrimination based on race and national origin.  In addition,

the record shows that Plaintiff filed a formal EEO complaint in March 2004 and that Defendant's

supervisors were generally aware that Plaintiff had engaged in EEO activity.  *See Kessler*, 461

F.3d at 210 (noting that good faith, reasonable belief that Plaintiff was engaging in a protected

activity is sufficient to make out a prima facie case).[13]  Thus, the Court's analysis focuses on

whether Plaintiff can establish the third and fourth elements of the prima facie test.

### a. Materially Adverse Action

The standard for proving a materially adverse employment action in the retaliation

context is less stringent than the standard for proving an adverse employment action in the

discrimination context.  *See Hinton v. City Coll. of New York*, No. 05-CV-8951, 2008 WL

591802, at *27 (S.D.N.Y. Feb. 29, 2008) ("Title VII's core anti-discriminatory provisions are

---

[13] Plaintiff also suggests that his fifteen-day suspension was in retaliation for his filing of the TIGTA complaint against Martel on May 12, 2005.  (Def.'s Ex. D, at 9.)  Yet, even taking the evidence in the light most favorable to Plaintiff, Plaintiff cannot state a retaliation claim on this basis.  In filing the TIGTA complaint, Plaintiff was not "engaged in protected activity by opposing a practice made unlawful by Title VII."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).  Plaintiff's TIGTA complaint concerned accusations that Martel had violated IRS rules, but it did not relate, even tangentially, to any good faith, reasonable belief that Martel was engaged in any violation of Title VII.  Therefore, the filing of the TIGTA complaint against Martel cannot form the basis for Plaintiff's retaliation claim.  *See Gelin*, 2005 WL 2456742, at *11 ("Plaintiff's allegations that he was retaliated against for filing a TIGTA complaint against Chillemi are dismissed because that complaint did not concern an employment practice made unlawful by Title VII.").

narrower than Title VII's retaliation provisions and what might not qualify as an adverse

employment action under Title VII's anti-discrimination provisions may still violate Title VII's

anti-retaliation provisions" (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61

(2006)); *see also Hill*, 467 F. Supp. 2d at 362-63 (noting that though certain events described by

plaintiff do not constitute adverse employment actions for purposes of plaintiff's employment

discrimination claim, they may be considered adverse actions for purposes of her retaliation

claim).  Unlike the test for a discriminatory adverse employment action, a material adverse

employment action in the retaliation context need not "affect employment or alter the conditions

of the workplace."  *White*, 548 U.S. at 62.  Instead, a plaintiff need only demonstrate that "a

reasonable employee would have found the challenged action materially adverse, which in this

context means it well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination."  *Id*. at 68 (internal quotation marks omitted).  To meet this standard, a

plaintiff must allege a "significant" rather than a "trivial" harm, which would be "likely 'to deter

victims of discrimination from complaining to the EEOC,' the courts, and their employers.'"  *Id*.

(quoting *Robinson v. Shell Oil, Co.*, 519 U.S. 337, 346 (1997)).  For "a single, acute incident of

abuse" to qualify as an adverse employment action, it must be an "intolerable alteration of the

plaintiff's working conditions, so as to substantially interfere with or impair his ability to do his

job."  *Mathirampuzha*, 548 F.3d at 79 (internal quotation marks and citations omitted).  The

Supreme Court has highlighted that the alleged adverse employment action must be viewed from

the perspective of the reasonable employee, because "[Title VII's] standard for judging harm

must be objective" to avoid "the uncertainties and unfair discrepancies that can plague a judicial

effort to determine a plaintiff's unusual subjective feelings."  *White*, 548 U.S. at 68-69.

40

For purposes of this motion, the Court is willing to assume that the following incidents meet this test:  (1) Plaintiff's fifteen-day suspension, *see Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 384-85 (S.D.N.Y. 2007) (accepting that suspension as materially adverse employment action); (2) the disruption to his remote access to the IRS computer system, *see Terry*, 336 F.3d at 145 (holding that suspension of use of government-owned vehicle was materially adverse where "it appears that to fully engage in his . . . position [plaintiff] would have had to perform field work."); and (3) the alleged failure to assign Plaintiff managerial duties, *see Antonmarchi*, 2008 WL 4444609, at *12 (determining that failure to promote to managerial position is materially adverse action).  The other incidents Plaintiff cites, however, do not.[14]

A reasonable worker would not feel dissuaded from filing a discrimination claim after experiencing several of the various inconveniences cited by Plaintiff, namely the incidents involving (i) his nominal – but not physical – transfer; (ii) his brief assignment to previously classified cases; (iii) his assignment to twenty-one partnership cases that he was allowed to return; (iv) his disagreement with Marinucci; (v) the tracking of Plaintiff's closed cases; (vi) the delayed processing of Plaintiff's travel voucher; and (vii) the vacancy announcements, as Plaintiff did not experience any negative repercussions as a result of these incidents.  *See Pacheco*, 2009 WL 55886, at *20-21 (determining that material adversity standard in retaliation context was not met where plaintiff "suffered no adverse consequences" or experienced only

---

[14] In his Memorandum of Law, Plaintiff argues that in January 2007, Defendant retaliated against him for filing his Complaint in this case by cancelling a training session Plaintiff was to lead in Cincinnati.  (Pl.'s Mem. 18.)  Because Plaintiff has not exhausted his remedies on this claim of retaliation – and, indeed, because the Complaint has not been amended to include this allegation as a basis for recovery – Plaintiff's retaliation claim could not survive summary judgment on the basis of that allegation, even if it were supported by the evidence.

trivial harms); *see, e.g.*, *id.* (finding that transfer that was not "less desirable or disadvantageous

than [plaintiff's] prior job" and increased workload, including receipt of a difficult assignment,

did not meet *White*'s standard for adverse employment actions); *Wilson v. Emhart Teknologies*

*LLC*, 566 F. Supp. 2d 120, 123 (D. Conn. 2008) (declining to recognize mere conflicts with

supervisors as adverse employment actions where no negative consequence, such as termination,

resulted from the disputes); *Hill*, 467 F. Supp. 2d at 363 (holding that "[b]eing asked to provide

documentation for vacation and experiencing a delay in replacing a lost key" are not materially

adverse actions); *Moultrie v. Potter*, No. 04-CV-6887, 2007 WL 2106196, at *9-10 (S.D.N.Y.

July 24, 2007) (holding that actions were not materially adverse where they were trivial harms

that, in any event, caused no harm or injury to the plaintiff).  Indeed, these incidents were

nothing more than "routine inconveniences that come with working at a large bureaucracy."

*Moultrie*, 2007 WL 2106196, at *9-10 (citing *Hill*, 467 F. Supp. 2d at 363); *Gamble v. Chertoff*,

No. 04-CV-9410, 2006 WL 3794290, at *8 (S.D.N.Y. Dec. 27, 2006) (holding that an instruction

to switch cubicles had only a "trivial effect" on the plaintiff, and "[a] jury could not reasonably

conclude that [it] . . . would have dissuaded a reasonable employee from pursuing her

discrimination claims").  "An employee's decision to report discriminatory behavior" simply

does not "immunize [him] from those petty slights or minor annoyances that often take place at

work and that all employees experience."  *White*, 548 U.S. at 68.  This is particularly true where,

as here, Plaintiff has offered no evidence showing that he suffered any harm or injury as a result

of these actions.

### b. Causal Connection

Proof of causation can be shown either:  (1) "directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant," or (2) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Butts v. New York City Dep't of Hous. Pres. & Dev.*, No. 00-CV-6307, 2007 WL 259937, at *17-18 (S.D.N.Y. Jan. 29, 2007) (holding that a causal connection may be shown through circumstantial evidence), *aff'd* No. 07-CV-1930, 2009 WL 190403, at *1 (2d Cir. Jan. 28, 2009). For temporal proximity of the protected activity and the alleged retaliation to constitute "sufficient evidence of causality to establish a prima facie case . . . the temporal proximity must be very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted); *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc*., 263 F.3d 208, 224 (2d Cir. 2001) (same). However, the Second Circuit has "'not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of [protected activity] and an allegedly retaliatory action.'" *Espinal v. Goord*, 554 F.3d 216, 228 (2d Cir. 2009) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001)); *see also Monterroso*, 591 F. Supp. 2d at 583 (S.D.N.Y. Oct. 28, 2008) (same). The absence of a bright line allows a court "to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal*, 554 F.3d at 228.

<u>i. Plaintiff's Fifteen-Day Suspension</u>

Plaintiff has not presented direct evidence to demonstrate that his fifteen-day suspension was motivated by "retaliatory animus" based on his prior EEO activity.  For example, he has not provided evidence that any of his supervisors made any remark that suggested such retaliatory animus.  *Compare Lomotey v. Connect. Dep't of Transp.*, No. 05-CV-1711, 2009 WL 82501, at *10 (D. Conn. Jan. 12, 2009) ("Plaintiff offers no direct evidence, such as negative comments by supervisors about his . . .  testimony, that his non-promotion was attributable to retaliatory animus."), *with Rolon v. Ward*, No. 05-CV-168, 2008 WL 4700705, at *25 (S.D.N.Y. Oct. 24, 2008) (concluding that supervisor's statement in plaintiff's evaluation that he "sets himself back with personal complaints" could constitute direct evidence of a causal connection).

However, Plaintiff has arguably met his burden of presenting circumstantial evidence of causation based on temporal proximity.  Plaintiff notes that he filed an EEO complaint against McLaughlin and Smith on July 5, 2005, that his supervisors were generally aware of Plaintiff's prior EEO activity, and that he received the letter proposing his fifteen-day suspension on July 11, 2005.  (Pl.'s Mem. 23.)  The close temporal proximity between Plaintiff's alleged EEO activity on July 5, 2005 and Smith's proposal of Plaintiff's suspension six days later could support a finding of a causal connection.  *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (holding that twelve days between protected activity and alleged retaliatory action was sufficient to suggest a causal connection); *Morey v. Somers Cent. Sch. Dist.*, No. 06-CV-1877, 2007 WL 867203, at *11 (S.D.N.Y. Mar. 21, 2007) (finding causal connection met where "it could have been a matter of days (or at most a month) between" protected activity and alleged adverse action).  While the fact that the suspension was only imposed after a hearing and

investigation may attenuate the causal connection, the Court is nevertheless willing to assume that Plaintiff has made out a prima facie case of retaliation on this claim.

### ii. Suspension of Plaintiff's Remote Access

Plaintiff also has presented sufficient circumstantial evidence of a causal connection between the filing of his EEO complaint and the suspension of his remote access. As with his fifteen-day suspension, Plaintiff has not submitted any direct evidence, such as retaliatory remarks by supervisors, or that the suspension of his remote access was related to his filing of an EEO complaint. Nevertheless, the fact that Plaintiff's remote access was suspended on October 12, 2005, just three months after his alleged EEO complaint was filed, arguably creates sufficient temporal proximity to suggest a causal connection. *See Cruz v. Oxford Health Plans, Inc*., No. 03-CV-8863, 2008 WL 509195, at \*10 (S.D.N.Y. Feb. 26, 2008) (finding three to five month period sufficiently short to suggest a causal connection); *Santos v. Costco Wholesale, Inc*., 271 F. Supp. 2d 565, 575 (S.D.N.Y. 2003) (approximately three months sufficient to establish prima facie case). *But see Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (holding that three-month delay in taking adverse action was fatal to showing of causation); *Cunningham v. Consol. Edison Inc.*, No. 03-CV-3522, 2006 WL 842914, at \*19 (E.D.N.Y. Mar. 28, 2006) (finding three months too remote). Accordingly, the Court will assume that Plaintiff has made out a prima facie case on this claim.

### iii. Non-Assignment to Managerial Duties

Finally, the Court is willing to assume that Plaintiff's claim that he was not assigned managerial duties in retaliation for filing his EEO complaint also states a prima facie case. Once again, Plaintiff has not submitted any direct evidence of a causal connection between his EEO

45

complaint and his non-assignment to managerial duties, such as a statement by a supervisor that

evidences retaliatory animus.  *See Martinez v. New York City Dep't of Educ.*, No. 04-CV-2728,

2008 WL 2220638, at *13 (S.D.N.Y. May 27, 2008) (finding that plaintiff failed to show a

causal connection where he did not present "evidence, for example, of any statement by any

supervisor with respect to Plaintiff's protected activities, and there [wa]s no evidence of

retaliation against other employees engaged in protected activities").[15]  Nevertheless, Plaintiff

has submitted evidence that a temporal connection existed between his nonassignment to

managerial duties, between July 2005 and October 2005, and the filing of his EEO complaint on

July 5, 2005.

c. Nonretaliatory Reasons for the Adverse Actions

Assuming Plaintiff has made out a prima facie case regarding each of the three adverse

---

[15] Plaintiff attempts to support his claim by submitting the Declaration of his coworker Osmond Brown, who states he personally "filed several EEO complaints against the Defendant" alleging "discrimination, harassment, retaliation, and hostile working condition" and that he was not selected for promotions.  (Pl.'s Ex. A (Decl. of Osmond Brown), at 1-2.)  Brown's Declaration is insufficient to support a causal connection between Plaintiff's non-assignment to managerial duties and his EEO complaint.  First, Brown's Declaration does not include any claim that he had personal knowledge that Plaintiff's supervisors acted with retaliatory motives toward him – indeed, Brown does not even claim awareness of Plaintiff's EEO activity.  Second, Brown's claim that he personally was subject to retaliation in the form of a failure to promote him does not establish a causal connection in Plaintiff's case.  Indeed, Brown's affidavit consists largely of conclusory allegations and personal opinions.  *See Divers v. Metro. Jewish Health Sys.*, No. 06-CV-6704, 2009 WL 103703, at *17 (E.D.N.Y. Jan. 14, 2009) (refusing to find inference of discrimination based on affidavit of another employee of defendant whose "affidavit consists largely of conclusory allegations and personal opinions"); *Moore v. New York State Div. of Parole*, No. 06-CV-1973, 2008 WL 4394677, at *10 (E.D.N.Y. Sept. 23, 2008) (affidavit stating coworker's personal belief that plaintiff and other employees were discriminated against because of their race and gender where other evidence was facially neutral was insufficient to defeat summary judgment motion).  This is particularly true given that Brown does not even allege that the decisionmakers who retaliated against him were the same individuals that decided not to assign Plaintiff managerial duties.

employment actions discussed above, summary judgment is warranted on Plaintiff's retaliation

claims because Defendant has presented legitimate nonretaliatory reasons for each of the

materially adverse employment actions.  *See Singleton v. Mukasey*, No. 06-CV-6588, 2008 WL

2512474, at *6 (S.D.N.Y. June 13, 2008) (dismissing retaliation claim on summary judgment

where defendant presented legitimate reasons for the adverse actions, and plaintiff failed to show

that those explanations were pretext).  As discussed at length in the context of Plaintiff's

discrimination claims, *see supra* Section I.B.1.c, Defendant has submitted evidence that:  (1)

Plaintiff's fifteen-day suspension was imposed solely because of Plaintiff's misconduct (Pl.'s Ex.

G, at 2; Pl.'s Ex. X; Def.'s Ex. D, at 2); (2) Plaintiff's inability to gain remote access resulted

from his fifteen-day suspension and from his own failure to submit the proper forms to the IT

Department to gain remote access (McLaughlin Decl. ¶¶ 30-31, Exs. I & J); and (3) Plaintiff was

not assigned managerial duties because of his improper conduct and his refusal to attend

mandatory group meetings (Pl.'s Ex. P, at 15).  Plaintiff has provided no basis from which a

reasonable factfinder could conclude that these reasons were pretextual.  Therefore, summary

judgment is granted for Defendant on Plaintiff's retaliation claims.

### 3. Hostile Work Environment Claim

Read broadly, Plaintiff's Complaint alleges a hostile work environment, relying on the

incidents described above as well as an alleged statement by Becker that Plaintiff "has a problem

with the English language and that he has to go to school to learn the English language."  (Pl.'s

Mem. 23, 26.)  To establish a hostile work environment claim, Plaintiff must demonstrate

"(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [his]

employment and create an abusive working environment, and (2) that a specific basis exists for

47

imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993).

To meet the first part of the test for a hostile working environment, Plaintiff must demonstrate that, under the totality of the circumstances, "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered."  *Alfano*, 294 F.3d at 373; *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).  "Plaintiff must show not only that []he subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive."  *Demoret*, 451 F.3d at 149 (citing *Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d Cir. 2003)).  "Factors that a court might consider in assessing the totality of the circumstances include:  (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'"  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Harris*, 510 U.S. at 23).  Finally, to establish a racially hostile working environment, Plaintiff must present some facts that suggest that the challenged conduct occurred because of his race or national origin.  *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999) (holding that plaintiff could not succeed on hostile working environment claim where evidence did not show that complained of comments were made because of her race), abrogated on other grounds by *White*, 548 U.S. at 62; *cf. Alfano*, 294 F.3d at 375 ("[I]t is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex.").

Here, the totality of the circumstances simply did not create a hostile work environment as a matter of law.  The record is devoid of sufficient evidence from which a rational factfinder could find that Plaintiff's working conditions were altered by intimidation, ridicule or insult because of his race or national origin.  As discussed at length, the bulk of the incidents to which Plaintiff cites were mere inconveniences, which did not even alter his working conditions. Indeed, much of the tension arising from these incidents was triggered by Plaintiff's assumption that others with whom he worked were acting outside the law or out of improper motives. Moreover, even the three incidents that did have a tangible effect on Plaintiff's working conditions – his fifteen-day suspension, the disruption to his remote access, and his nonassignment to managerial duties – could not reasonably be found to create a hostile working environment under Title VII, as Plaintiff has failed to submit evidence that Defendant took these actions because of Plaintiff's race or national origin.  *See Richardson*, 180 F.3d at 440 (holding that plaintiff could not succeed on hostile working environment claim where evidence did not show that complained of comments were made because of her race); *Ifill v. United Parcel Service*, No. 04-CV-5963, 2008 WL 2796599, at *11 (S.D.N.Y. July 17, 2008) ("Because [p]laintiff proffers no other evidence that [the] treatment . . . was because of her sex or race, there is no genuine issue of material fact in connection with her hostile work environment claim . . . ." (citing *Alfano*, 294 F.3d at 375); *Woods v. Enlarged Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 521 (S.D.N.Y. 2007) (dismissing hostile working environment claim on the basis that "Title VII requires that plaintiff show evidence that she was discriminated against because of her race, and this she has not done").

Additionally, Becker's alleged comment about Plaintiff's knowledge of the English

language – an allegation Plaintiff failed to state in his Complaint – on its own is not sufficient to defeat summary judgment.  "Even assuming this allegation to be true, [this] isolated . . . conduct does not support a hostile work environment claim."  *Monterroso*, 591 F. Supp. 2d at 584 (holding that plaintiff did not demonstrate a hostile working environment by showing that she had been called a "stupid Italian" on several occasions); *see also Markus v. Teachers Ins. & Annuity Ass'n Coll. Ret. Equities Fund*, No. 03-CV-656, 2005 WL 742635, at *8 (S.D.N.Y. Mar. 29, 2005) (finding incidents not sufficiently "intimidating, pervasive, and insulting . . . to sustain a hostile work environment claim" where plaintiff was called "Zsa Zsa Gabor" and a "foreign snob" by other coworkers and where supervisors "criticized her 'Hungarian English'"); *cf. Pozo v. J & J Hotel Co.*, No. 06-CV-2004, 2007 WL 1376403, at *17 (S.D.N.Y. May 10, 2007) (finding conduct sufficiently severe and pervasive where employee was mocked by her supervisor on a daily basis for her inability to speak English, she was told repeatedly to "go back to Cuba," and she was assigned to poorer working conditions than a similarly situated employee of a different race).

Nor has Plaintiff presented any reason to impute Becker's alleged conduct to Defendant. "Where the conduct creating a hostile work environment is committed by non-supervisory co-workers, the plaintiff must show that the employer knew of the discriminatory conduct and did not take appropriate actions to remedy it."  *Chenette v. Kenneth Cole Prods., Inc.*, No. 05-CV-4849, 2008 WL 3176088, at *10 (S.D.N.Y. Aug. 6, 2008); *see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996) (holding that where "[t]he harassment which led to the hostile work environment was attributable to a co-worker, not a supervisor," the plaintiff "must demonstrate that [the employer] either provided no reasonable avenue for

50

complaint or knew of the harassment but did nothing about it") (internal quotation marks omitted); *Brown v. Orange & Rockland Util., Inc.*, No. 05-CV-4896, --- F. Supp. 2d ----, 2009 WL 205862, at *9 (S.D.N.Y. Jan. 21, 2009) (holding that to impute alleged harassing conduct of a coworker to the employer, the plaintiff must show that the employer "'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it'" (quoting *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 69 (2d Cir. 2000))).  Here, although Plaintiff alleges that Becker was an IRS Group Manager (Pl.'s Mem. 23), Plaintiff does not allege nor present evidence to suggest that she had supervisory authority over him.  Plaintiff has also presented no evidence that he reported Becker's alleged conduct to his supervisors, that her conduct was so open and notorious that Plaintiff's supervisors should have been aware of it, or that Plaintiff's supervisors failed to take appropriate action based on any such report.  *Cf. Krikelis v. Vassar Coll.*, 581 F. Supp. 2d 476, 490 (S.D.N.Y. 2008) (imputing conduct to employer where fact finder could find that "mistreatment . . . was open and notorious and . . . managers had specific notice on which they failed to act"); *Moore v. Consol. Edison Co. of New York*, No. 00-CV-7384, 2007 WL 831807, at *9 (S.D.N.Y. Mar. 20, 2007) ("The fact that some awareness of [the] conduct existed at multiple supervisory levels is sufficient to make [defendant's] knowledge of the hostile work environment a jury issue . . . .").  Accordingly, Defendant's motion for summary judgment on Plaintiff's hostile working environment claim is granted.

51

### III. Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 17), to enter judgment for Defendant, and to close the case.

SO ORDERED.

Dated:      March **26**, 2009
               White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

52